# ALESSANDRA DEBLASIO
## *Attorney At Law*
ad@adeblasiolaw.com | www.adeblasiolaw.com

299 Broadway, Suite 1893
New York, New York 10007
Phone: (212) 321-7084
Fax: (973) 689-2765

June 10, 2018

By Electronic Case Filing System
The Hon. Denise L. Cote
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     *U.S. v. Oscar Monzon*, Criminal No. 99-0157 (DLC)

Dear Judge Cote:

Please accept this letter in lieu of a formal motion to reduce Defendant Oscar Monzon's life sentence to 360 months, pursuant to 18 U.S.C. § 3582(c)(2) and U.S.S.G. § 1B1.10. Previously, in 2015, this Court denied his § 3582(c)(2) *pro se* motion without prejudice to re-file in seven years, not before January 3, 2022. (Dkt. entry #453) Then, upon undersigned counsel's request for reconsideration of that order, it granted Mr. Monzon the opportunity to re-file his motion without waiting until 2022. (Dkt. entry #457)

Undersigned counsel did not immediately re-file the motion in 2015, believing that the Court did not arbitrarily choose the year 2022, but must have had its reasons for postponing any decision. A good three years having now elapsed, and circumstances having changed, counsel believes that the time is not only right, but that it is critical that Mr. Monzon have his re-sentencing hearing now, and that he be granted a sentence reduction.

The urgency turns on Mr. Monzon's very poor health, which requires both a medical intervention – that has proved to be unavailable while he remains in a maximum security facility under a life sentence – and a low-stress environment. To the point, since his massive heart attack in May 2015, Mr. Monzon's heart function has been hovering at 25% and while all medical personnel have recognized since 2015 that implanting a defibrillator should be considered, the procedure has not been done and apparently will not be done on account of his sentencing status. If he receives a reduced sentence, he will have a chance at a defibrillator in time to prolong his life.

Thus, by means of this letter and with some urgency, we now re-file the motion for a sentence reduction, and respectfully ask the Court at this time to re-sentence Mr. Monzon to 360 months.

**Background - Medical**

On May 21, 2015, within a few weeks of learning that the Court directed him to wait until 2022 to learn if he would have his life sentence reduced, Defendant Monzon suffered a massive heart attack. A quick-acting cellmate and an extremely diligent MDC-Brooklyn Corrections Officer were able to save his life, but not before he had fallen into a coma.

For purposes of this sentencing reduction motion, I engaged a Board-certified cardiologist, Jonathan Mauser, MD, FACC, to review the available prison medical records and write a report explaining to the Court Mr. Monzon's medical condition and stating an opinion as to treatment needed. The following summary of Mr. Monzon's medical condition and prognosis is taken from that report, which is attached together with Dr. Mauser's curriculum vitae as **Exhibit A**.

On May 21, 2015, Mr. Monzon was transported from MDC to Lutheran Medical Center in Brooklyn, in coma status. According to Dr. Mauser's review, on account of the coma, hospital personnel decided to delay a cardiac catheterization procedure that would have dramatically reduced the damage to Mr. Monzon's heart muscle.

The delay, which was unduly excessive according to Dr. Mauser, was contraindicated by the American Medical Association standards and protocols, and resulted in Mr. Monzon's cardiac function being "severely and permanently compromised." (Mauser Rep't at 2) According to Dr. Mauser, Mr. Monzon's morbidity and mortality – illness and death related to disease or treatment – in the near term and long term increased. (*Id.* at 4) Indeed, a 2017 echocardiogram confirmed that his heart function "remained severely decreased at 25-30% as a consequence of the events of 5.20.15 [the heart attack at MDC]." (*Id.*)

According to Dr. Mauser, patients with this degree of dysfunction are at increased risk over the long term for heart failure, life-threatening arrhythmias, sudden cardiac arrest, stroke and decreased survival. Optimal management includes medical therapy as well as consideration of an implantable defibrillator to decrease morbidity and mortality. (*Id.*)

Lutheran hospital records from 2015, as well as Bureau of Prison records since that time, all indicate that Mr. Monzon's condition requires consideration of an implantable defibrillator. However, as Dr. Mauser notes, the decision about such a defibrillator is "usually made at 40 days after the heart attack or angioplasty (not 2+ years as in this case)." (*Id.* at 5)

While Mr. Monzon (and undersigned counsel) waited for this procedure to be considered and performed, it has not been done and given that three years have now passed, it has become apparent that the costly procedure is not ever going to be approved, likely on account of Mr. Monzon's status as a prisoner with a life sentence.

Apart from the defibrillator, Dr. Mauser notes that the record of his most recent 2017 medical visit documents poor blood pressure control and does not include "recommended medical agents for heart failure such as aldosterone antagonists and sacubitrilvalsartan." (*Id.* at 5) According to Dr. Mauser, Mr. Monzon "remains at risk for cardiac arrest which may be in the range of 20% annually." (*Id.*)

In addition then to the need for a defibrillator and appropriate medications, Dr. Mauser gives the following opinion with regard to Mr. Monzon's prognosis:

> In my opinion, based on my review of Mr. Monzon's available records, improving access to more timely and quality medical care will be necessary in order to improve his function and survival in the future. Other important measures that would contribute to a better outcome for this patient include: stress reduction, healthy diet, and regular moderate exercise.

*Id.* at 5.

We come now to ask the Court to proceed with its evaluation of whether Mr. Monzon merits a discretionary reduction in sentence to 360 months. We believe he merits the reduction, and we discuss below his eligibility and the rationale for granting the reduction in Mr. Monzon's case, as well as what the consequences might be for Mr. Monzon's health if he were granted a reduced sentence and thus permitted to transfer to a minimum-security facility.

## Section 3582(c)(2): Eligibility

On November 28, 2001, this Court sentenced Defendant Monzon to a term of life imprisonment following a jury verdict for conspiracy to distribute crack and powder cocaine. Defendant Monzon's sentencing Guidelines range was life imprisonment, based on an offense level of 44 and a criminal history category of IV.

The Probation Department's original 2001 Pre-Sentence Investigation Report ("PSR") indicated that Defendant Monzon was responsible for the conspiracy's sale of 62 grams of crack and 100 grams of powder cocaine each week for 3 years (156 weeks), totaling 9.62 kilograms of crack and 15.6 kilograms of powder cocaine. At the time of sentencing, the ratio of crack to powder cocaine was 100:1. Accordingly, the PSR indicated a base offense level of 38 for 977.6 kilos of cocaine (9.62 kilos of crack x 100 + 15.6 kilos of powder), which was the equivalent of 195,520 kilograms of marijuana. (PSR ¶ 54)

The PSR included a four-level upward adjustment for role and a two-level enhancement for possession of a firearm, resulting in a total offense level of 44. At Criminal History Category IV the sentencing range was life.

The Court adopted the findings of the PSR and sentenced Defendant Monzon to a term of life. This Court had no discretion in 2001 to depart from the life sentence as the Guidelines were then mandatory. *See, e.g.*, *Dillon v. United States*, 560 U.S. 817, 820 (2010) ("Except in limited circumstances, district courts lacked discretion to depart from the Guidelines range.").

Effective November 1, 2014, the United States Sentencing Commission ("Sentencing Commission") amended the United States Sentencing Guidelines Manual ("Guidelines") to lower the Guidelines sentencing range for certain categories of offenses involving drugs. The Sentencing Commission also adopted an amendment to § 1B1.10 of the Guidelines authorizing, effective November 1, 2014, retroactive application of the amendment to the drug guidelines.

In this case, at the direction of the Court, the Probation Office supplemented its original PSR and determined that Defendant Monzon is eligible for a sentence reduction. Probation found that when calculating the 9.62 kilograms of crack by the new 18:1 ratio for crack to powder cocaine, under § 2D1.1(c) and § 1B1.10 the base offense level is now 36. (Supp. PSR at 2) After applying the specific offense characteristics and Chapter 3 adjustments utilized at the time of the original sentencing, the adjusted offense level is 42. (*Id.*) Based on an offense level of 42 and a Criminal History Category of IV, the amended guideline range is 360 months to life. (*Id.*) We ask the Court to adopt the PSR's findings.

## Section 3582(c)(2):  Merit

Once the Court determines a defendant to be eligible for a reduction in sentence, it must decide in light of the applicable Section 3553(a) factors whether to grant a reduction under the particular circumstances of the case. *Dillon*, 560 U.S. at 827. This decision is committed to the Court's discretion. *See U.S. v. Mock*, 612 F.3d 133, 137 (2d Cir. 2010). Further, "the court shall not reduce the defendant's term of imprisonment . . . to a term that is less than the minimum of the amended guideline range" for any reason other than the defendant's substantial assistance to the government, which is not applicable here. *U.S. v. Steele*, 714 F.3d 751, 755 (2d Cir. 2013) (citing U.S.S.G. § 1B1.10(b)(2)).

Mr. Monzon has a spotless disciplinary record during his past 21 years in prison. (*See* Supp. PSR at 2, no "disciplinary sanctions for violence or assaultive behavior.") While a significant achievement on its own, it is not merely that he has stayed out of trouble, but that he has spent 21 years learning to recognize and atone for the trouble and significant criminality of his past.

Believing that he would never be released from his life sentence, Mr. Monzon nevertheless used his time to better himself. He did not succumb to despair, but instead gained new skills and emotional insight.

Attached are transcripts and certificates documenting the many courses Mr. Monzon successfully completed along the road of his rehabilitation. In addition to earning his GED in 2007, the courses include "choosing integrity:  the structure of character," adult continuing education, tutor training, men's fraternity, meditation, yoga, fitness, chess and public speaking, as well as numerous paralegal courses (earning a Legal Assistant/Paralegal Certificate with distinction in 2010) and more than 20 programs related to the air conditioning trade. (Exhibit B)

He changed from an arrogant, brash, headstrong, selfish young man, who gave no thought to the consequences of his actions, to someone whom prison officials asked to teach and guide others. He has spent a good portion of his 21 years trying to better the lot of his fellow inmates, teaching prison courses and leading religious services. What this says about Mr. Monzon is that he has come a significant way from the man he once was, who thought of little except how to make a buck off the misery of others, particularly the vulnerable and addicted members of society.

Attached as well are some performance ratings for his work while an Orderly at MDC-Brooklyn and as an instructor teaching fellow inmates English as a Second Language and GED courses. (Exhibit C)

As a "lifer," Mr. Monzon did not take and teach courses, and lead religious services, to curry favor with some Parole Board, or this Court. He has not done a single thing in 21 years just so this Court would reconsider his sentence, and it is for this very reason that it should reconsider his sentence. He took classes and taught classes because it helped others and it helped him to earn his own self-respect. His motivation is testament to his integrity.

Whoever he was 21 years ago, Oscar Monzon is by now an example of the best that the Bureau of Prisons could ever hope to achieve: he is calm, composed, humble, self-reflective, conscientious and solicitous of those around him. He had an extensive criminal history, some of it for very serious crimes, but it is from a different period in his life.

Mr. Monzon is also by now infirm and old beyond his 53 years. He no longer poses any threat to society, but will live out his remaining years cared for by family and, hopefully, gainfully employed in a trade that does not demand too much strength or exertion.

One of the strongest arguments in favor of this Court's exercising its discretion to the fullest extent possible is that Mr. Monzon's children themselves are not involved in the criminal justice system, and it is they who will bear primary responsibility for caring for their father in his declining years. Mr. Monzon managed to raise children who would not follow in his footsteps, but instead would lead law-abiding lives. One of his sons is, in fact, applying to enroll in the NY Police Academy this summer. In some instances, we might credit the mother completely, but not here where Mr. Monzon's wife was also involved in the drug conspiracy with him. Some way, somehow, they managed to keep their children clear of the streets, and this is to their credit.

If released, Mr. Monzon's extremely large and loving family, which has supported him all these years, will help him as he re-enters the community. He has 10 brothers and sisters, he has four children, he has dozens of nieces and nephews, and he has several grandchildren. Letters from many of them are attached to this letter and they attest to his being a changed man and one who merits release:

> "I think the prison system is in place to rehabilitate criminals like the one my dad used to be. My dad has always been a positive influence in my life, even through a prison cell. He has always told me to work hard for whatever it is I want and to always use his mistakes as my biggest learning experience. . . . I really hope that you can see the good in a very changed man. . . . I also know that my brothers, my family and I are his biggest support system and we will make sure to do everything we can to help him do what he has to do if reinserted back into society to be as productive as he can." (Son Osmanny Monzon)

> "[M]y mother went into a halfway house, then with the help of my family was able to quickly find a job . . . . She is currently working for Time Warner Cable as a Quality Assurance Specialist. . . . My father although still incarcerated has made great use of his time. He has studied many trades (I have his certificates); he received his GED and has also taken college courses in theology. . . . I know my father has changed for one big reason, growing up I always wanted to be a police officer. Growing up he would always try to change my mind telling me that was not a good career and what not. . . . I chose to

go for it and I graduated with my Associates in Criminal Justice. I told my father what my decision was and he has been my biggest supporter and fan in my career choice. He even helped me with some of my papers for college. . . . Now I am finishing up the paperwork to enter the NY Police Academy this summer." (Son Osdith Monzon)

"I watched [my father] change from being cold and distant to becoming warm and loving. . . . He demonstrates his sincere determination to make right the mistakes he has made not only within society, but also within his own family as well; I can attest to the fact that he has truly changed his life for the better." (Son Oscar Monzon, Jr.)

"I am writing this letter to express the importance of what it will mean to have my Father back in my family's life, my daughter's life, and most of all my life. . . . During his time away he spends his days in the library studying theology and the law. He also spends a lot of time in church staying away from trouble and making the best out of a difficult situation. . . My Father may not look like a good man in your eyes, but he has learned from his mistakes, and has become a strong man with great morals. . . . We will ensure that he will live with family, work, and contribute to society." (Son Audy Monzon)

"I watched my brother everyday in the hospital [in May 2015] up until they revoked his visitation in the hospital. My brother sat there and preached and lectured his kids, and all his nephews and nieces about either going to school or staying in school so they can become something of themselves. I could not believe that, as we were all there to support him and be there for him like he had done for us time and time again years ago, he still found a way to make it about his family and not himself. I say that to say this, my brother is a selfless, humble, family oriented man who has learned from his mistakes and is ready to be reintegrated into society." (Brother Jose Luis Monzon)

"I am writing this letter on behalf of my uncle Oscar Monzon. I am the daughter of one of his eleven (11) siblings, Aida Monzon. . . . He has played a very important role in my life as far as helping me become the woman I am today, despite his incarceration. If it weren't for the support, advice, encouragement, wisdom and guidance that my uncle has bestowed upon me, I probably would not have overcome many obstacles I have experienced. . . . He was my inspiration when I decided to further my education and go graduate from college because he always instilled in me the importance of going to school and becoming independent. . . . My uncle Oscar has served over 20 years in prison, which means I have served over 20 years alongside him. I am now 35 years old and continue to serve time with him because I love my uncle and need him to understand that he is not forgotten even though he physically cannot be here with us. . . . [I] have even booked flights to travel to New York just to get one (1) hour of visitation with him in a prison because he means that much to me. . . . We will be there with open arms and hearts to welcome him home and ensure that he gets on his feet. My uncle will have a place to live and the medical attention he now requires. We are prepared and more than willing to walk beside him during his journey in the outside world, as we have throughout his incarceration." (Niece Jesmar Olivo)

"I am one of Oscar Monzon's many nephews. . . . It was with great shock that I found out about the charge he was facing. I myself work as a Correctional Officer (since 2008 with Miami Dade Corrections & Rehabilitation Department) . . . [a]nd it was my Uncle Oscar who was my top motivator to become a corrections officer, he thought it would be a good career for me and at first I didn't believe him, but I actually ended up following his advice. . . . When he broke the law, my uncle was a young man raised without a father-figure and he went to the street, but he's a good man and I speak from my heart. . . . My uncle has shown great remorse. I say this not because I am his nephew, but because I truly believe it." (Nephew Frantseco Francisco)

"I am married to Jennifer Charles. She's one of Oscar Monzon's nieces. I have never had the honor of meeting him physically but my wife and him correspond regularly. . . . I know that he has received many certifications while he's been incarcerated. . . . <u>If he's released he can be the apprentice for my electrical company.</u> I would be honored to help him get on his feet and get reintegrated into society." (Nephew-in-law Christopher Charles)

"I have known Oscar Monzon since childhood, we played sports together and grew up in the same community in Washington Heights. . . . The NYS Department of Labor has programs to assist ex-offenders to reestablish employment and rebuild their lives upon release from prison. . . . His family support, his preparation and accomplishments as well as <u>employment assistance I offer</u> will ensure that Mr. Monzon will not be a burden to the State of New York." (Childhood friend Cesar A. Cabrera, Ed.D, Commissioner's Regional Representative - Western NY, NYS Department of Labor)

Letters attached as Exhibit D.

## **Section 3582(c)(2): Consequences for Mr. Monzon's Survival**

If the Court were to re-sentence Mr. Monzon from an indefinite life sentence to a fixed term of months, he would be eligible for transfer out of the maximum-security location where he is currently housed. After 21 years of impeccable conduct – which includes not just his good behavior but teaching and preaching within the prisons – he has earned the point level that would permit him entry into a minimum-security facility.

The maximum-security facility where he is currently is the very antithesis of the type of environment and lifestyle conditions he needs if he is to avoid another major cardiac event and premature death. Mr. Monzon is only permitted limited time out of his cell and there are often days on end of 24-hour lockdown for security reasons. The stress from the restrictive environment, as well as from the class of inmate housed in the maximum-security prison alongside him, jeopardizes Mr. Monzon's health every day he continues there.

At a minimum-security facility, on the other hand, he would be in the type of environment that Dr. Mauser opines is necessary to improve his function and chance at survival: greatly-reduced ambient stress; far more opportunity to engage in routine moderate exercise; better medical

management, including medications to stave off heart failure; and likely a healthier diet than the one provided to inmates in maximum security facilities. (See Mauser Report at 5.)

Moreover, as an inmate with a finite determinate sentence due for release in a few years, there is a chance that the Bureau of Prisons would authorize the expense of implanting a defibrillator. And if not, he would be able to have the procedure immediately upon release.

With a determinate sentence, Mr. Monzon would also be eligible for the 12-month RDAP drug treatment program. (Inmates with "indeterminate" life sentences are not eligible for the drug treatment program.) This program can only benefit Mr. Monzon and society.

## Section 3582(c)(2): Extent of the Reduction

This Court may grant a reduction in whole or in part, deciding in light of the applicable Section 3553(a) factors. *Dillon*, 560 U.S. at 827. We ask the Court to sentence Mr. Monzon at the very bottom of the 360-to-life Guidelines range.

A 360-month sentence is neither overly lenient nor inadequate to punish Mr. Monzon, deter others from selling drugs, and promote respect for the law. Mr. Monzon's conduct and behavior over the past 21 years of incarceration – as evidenced by prison records and attested to by family members who have supported him over these decades – could not have been better.

Moreover, taking into account his medical circumstances under 3553(a), his heart functioning at 25% and being at risk for cardiac arrest in the range of 20% annually, it is unlikely that Mr. Monzon would survive to complete for example a 480-month sentence. Conditions are simply too harsh and medical care too elusive in a penitentiary for him to survive too much longer inside. If this Court were to reduce his sentence now to 30 years, and recommend that he attend RDAP, he would be confined to a minimum-security facility and be eligible for release to a half-way house in or around 2021.

Thus, while we request the lowest-end of the Guidelines on humanitarian grounds – which in this case also happens to be well within the ambit of Section 3553(a) – we note too that if Congress were to set the ratio of crack to powder cocaine at 1:1, Mr. Monzon's Guidelines range would be 324-405 months.[1] Many courts have already begun sentencing crack cases at parity, either finding no rational support for the 18:1 ratio, or anticipating further congressional refinement. *See, e.g.*, *United States v. Gardner*, 20 F. Supp. 3d 468, 473 & n.5 (**S.D.N.Y.** 2014) (Rakoff, J.) ("[T]he Court finds no rational support for the 18:1 ratio, and consequently will apply a 1:1 ratio and will treat the quantity of crack cocaine attributed to the instant defendants' offenses of conviction as if it were the equivalent quantity of powder cocaine under the Guidelines."); *United States v. Medina*, No. 08-CR-256, 2009 WL 2948325 (**S.D. Cal.** Sept. 11, 2009); *United States v. Lewis*, 623 F. Supp. 2d 42, 45 (**D.D.C.** 2009); *United States v. Williams*, No. 09-CR-30099, 2010 WL 1325229 (**S.D. Ill.** Mar. 30, 2010); *United States v. Williams*, 788 F. Supp. 2d

---

[1] At a 1:1 ratio, the 9.62 kilos of crack + 15.6 kilos of powder for which Mr. Monzon is responsible total 25.22 kilos of cocaine. The corresponding base offense level is 32 and with the 6 levels of upward adjustments, the total offense level is 38. At Criminal History Category IV, level 38 corresponds to a range of 324 to 405 months.

847 (**N.D. Iowa** 2011); *Henderson v. United States*, 660 F. Supp. 2d 751, 755 (**E.D. La.** 2009); *United States v. Whigham*, 754 F. Supp. 2d 239, 246 (**D. Mass.** 2010); *United States v. Shull*, 793 F. Supp. 2d 1048, 1064 (**S.D. Ohio** 2011); *United States v. Owens*, Crim. No. 08-48 Erie, 2009 WL 2485842 (**W.D. Pa.** Aug. 12, 2009); *United States v. Greer*, 699 F. Supp. 2d 876, 880 (**E.D. Tex.** 2010); *United States v. Carter*, 2009 WL 2578958 (**W.D. Va.** Aug. 18, 2009); *United States v. Evans*, No. 08-CR-172, 2010 WL 2287054 (**E.D. Wis.** June 7, 2010); *see also United States v. Morris*, 775 F.3d 882, 884, 887 (**7th Cir.** 2015) (vacating sentence, remanding for court's procedural error in "fail[ing] to address" defendant's request "to apply a 1:1 crack-to-powder cocaine ratio for his offense").

Anticipating that Mr. Monzon may not live to see such 1:1 parity, we ask for the lowest-possible sentence available to him now.

**Conclusion**

Considering the excessiveness of the crack cocaine guideline that dictated Mr. Monzon's then mandatory life sentence in 2001, considering his remorse and rehabilitation over the past 21 years, considering the precarious state of his health and need for immediate and significant medical attention, and considering the adequacy of a 360-month term, the Court is well within its discretion under 18 U.S.C. § 3582(c)(2) to reduce Mr. Monzon's sentence to 360 months' imprisonment.[2]

Respectfully,

Alessandra DeBlasio

cc:     Mr. Oscar Monzon (by U.S. mail)

---

[2] Mr. Monzon asks the Court to consider Amendments 706, 711 and 750 as well as 782, believing that he is eligible for more than a single 2-level reduction in base offense level.  *See Pro Se* Motion, Dkt. #450 pp. 2-4.  According to undersigned counsel's calculations, until Amendment 782, none of the previous amendments served to sufficiently reduce the calculated quantity of crack to change his offense level under U.S.S.G. § 2D1.1(c).